Date signed November 18, 2015



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   10-37371-TJC |
| KH Funding Company | * | Chapter   11 |
| Debtor | * | |
| *   *   *   *   *   *   *   * | * | |
| KH Funding Company | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  12-00821 |
| Aida Escobar | * | |
| Defendant | * | |
| *   *   *   *   *   *   *   *   *   *   *   *   * | | |

## <u>MEMORANDUM OF DECISION</u>

Debtor-plaintiff KH Funding Company brings this preference action against defendant Aida Escobar seeking to recover $134,717.15 of payments made to her during the twelve month period ending on the petition date.  At the conclusion of a two day trial held on October 14 and 30, 2015, defendant conceded that plaintiff established all elements of a preference claim under 11 U.S.C. §547(b)(1)-(5).  At issue is whether defendant is entitled to an ordinary course defense under §547(c)(2).  For the reasons stated herein, the court concludes that defendant has not carried her burden under §547(c)(2).  Judgement will be entered for plaintiff.

1

**Findings of Fact**

The plaintiff filed a petition under chapter 11 on December 3, 2010. Its business consisted primarily of originating, acquiring, and servicing loans, both business and residential. The plaintiff's plan of liquidation was confirmed on April 17, 2012. Under the plan, all remaining assets of the plaintiff are liquidated and distributed to creditors. Unsecured creditors are estimated to receive approximately 14% of their claims.

The plaintiff's liabilities greatly exceeded its assets in the year prior to the bankruptcy filing. It lost $9.3 million for calendar year 2009 and lost $12.7 million in 2010, and was very illiquid during that time. On December 21, 2009, the trustee under the plaintiff's indenture issued a notice of default based on the plaintiff's failure to pay certain noteholders. On February 5, 2010, the trustee accelerated all of the plaintiff's Series 3 and Series 4 notes. In a filing with the Securities and Exchange Commission, the plaintiff reported that the trustee was requiring it to immediately repay in full all amounts due under the notes, and the plaintiff was not able to do so. The plaintiff further stated that there "is a good possibility it will need to liquidate substantially all of its assets to satisfy these obligations." Pl's. Ex. 13 at p.3.

 Some of the loans held by plaintiff were secured by residential real estate. From time to time, plaintiff became the owner of this collateral, generally through foreclosure sale or deed in lieu thereof. Plaintiff refers to real property acquired this way as Other Real Estate Owned, or OREO.

Plaintiff generally would do maintenance and repair work to enhance the value of the OREO before selling it. The amount of work depended on the condition of the property and the sales price that it could obtain. Sometimes the work was cosmetic, such as light painting; at other times it might include installing a kitchen or work of more considerable cost and effort.

Plaintiff did this work through outside contractors and others.

Defendant met Robert Harris in 2007.  Mr. Harris is the co-founder of the plaintiff, and served as President and Chief Executive Officer from its incorporation in 1994 until after the bankruptcy case was filed.  When the two met, defendant worked as a security guard at a mall in which the plaintiff owned an interest.  They were married in August, 2010.

Defendant told Mr. Harris that she could provide contractor services, but he had no direct knowledge of her experience.  Defendant began providing contractor services on the OREO to the plaintiff in May 2010.  The amount, dates, and timing of the payments to defendant follow:

| Check # | Invoice Date | Approval Date | Check Date | Days | Amount |
|---------|--------------|---------------|------------|------|--------|
| 6022 | 05/26/2010 | 05/26/2010 | 05/26/2010 | 0 | $ 2,932.00 |
| 6068 | 06/07/2010 | 06/07/2010 | 06/07/2010 | 0 | 1,573.00 |
| 6105 | 06/17/2010 | 06/17/2010 | 06/17/2010 | 0 | 4,416.00 |
| 6106 | 06/17/2010 | 06/17/2010 | 06/17/2010 | 0 | 968.00 |
| 6133 | 06/23/2010 | 06/23/2010 | 06/24/2010 | 1 | 6,074.20 |
| 6146 | 07/01/2010 | 07/01/2010 | 07/01/2010 | 0 | 3,541.20 |
| 6172 | 07/08/2010 | 07/08/2010 | 07/08/2010 | 0 | 1,858.78 |
| 6250 | 08/04/2010 | 08/04/2010 | 08/04/2010 | 0 | 80.00 |
| 6251* | 08/04/2010 | 08/04/2010 | 08/04/2010 | 0 | 11,137.50 |
| 6305* | 08/19/2010 | 08/19/2010 | 08/19/2010 | 0 | 22,275.00 |
| 6350 | 09/01/2010 | 09/01/2010 | 09/01/2010 | 0 | 4,128.00 |
| 6364 | 09/07/2010 | 09/07/2010 | 09/09/2010 | 2 | 80.00 |
| 6382 | 09/09/2010 | 09/09/2010 | 09/09/2010 | 0 | 7,626.80 |
| 6383 | 09/09/2010 | 09/09/2010 | 09/09/2010 | 0 | 11,137.50 |
| 6403 | 09/16/2010 | 09/16/2010 | 09/16/2010 | 0 | 7,406.57 |
| 6441 | 09/28/2010 | 09/28/2010 | 09/29/2010 | 1 | 5,880.00 |
| 6469 | 10/07/2010 | 10/07/2010 | 10/07/2010 | 0 | 6,720.00 |
| CASH | No Invoice | | 10/20/2010 | n/a | 3,952.00 |
| CASH | No Invoice | | 10/26/2010 | n/a | 9,000.00 |
| CASH | No Invoice | | 11/06/2010 | n/a | 9,000.00 |
| 6569 | 11/10/2010 | 11/10/2010 | 11/10/2010 | 0 | 4,919.00 |
| 6588 | 11/17/2010 | 11/18/2010 | 11/17/2010 | 0 | 1,394.40 |

| 6598 | 11/18/2010 | 11/18/2010 | 11/18/2010 | 0 | 6,040.80 |
| 6609 | 11/24/2010 | 11/24/2010 | 11/24/2010 | 0 | 2,576.40 |
| **TOTAL** | | | | | **$134,717.15** |

* Based on proposal/no invoice for draw request

As can be seen in the chart, on three occasions (October 20 and 26 and November 6), the defendant was paid in cash without submitting an invoice. On two other occasions, marked by an asterisk, the defendant was paid based on a proposal, without submitting an invoice. On the remaining occasions, Mr. Harris would prepare handwritten invoices for defendant. He would meet with defendant or talk to her on the phone and she would give him the information that he put in the invoice. Mr. Harris would approve the invoice upon completing it, and would walk the invoice to the paying department. The paying department would issue a check and give it to Mr. Harris to give to the defendant or leave it for the defendant to pick up. On every occasion but three, the paying department issued a check on the same day Mr. Harris prepared and approved the invoice. On two of the three occasions (check nos. 6133 and 6441), the paying department issued a check the next day. On the third occasion (check no. 6364), the paying department issued a check two days after Mr. Harris prepared and approved the invoice.

**Conclusions of Law**

Defendant concedes that plaintiff has established that the $134,717.15 of payments made to the defendant during the preference period are avoidable preferences under §547(b)(1)-(5), subject to any defenses.[1] Defendant asserts two defenses: the payments were ordinary course payments under §547(c)(2) and, even if the payments are avoidable as preferences, plaintiff can

---

[1] At trial, and in a Memorandum and Order issued contemporaneously herewith (ECF 65), the court rejected the defendant's request to be relieved of her admission that she was an insider of the plaintiff at all relevant times. *See* ECF 6 at ¶7. Accordingly, the one year look back period of §547(b)(4)(B) applies.

4

only recover defendant's profit from the payments and not the amounts defendant had to pay to

her workers, for supplies, and the like.  Neither defense is availing.

As pertinent here, section 547(c)(2) provides that:

(c) The trustee may not avoid under this section a transfer –

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the
ordinary course of business or financial affairs of the debtor and the transferee, and such
transfer was –

> (A) made in the ordinary course of business or financial affairs of the debtor and
> the transferee; or
> (B) made according to ordinary business terms.

11 U.S.C. §547(c)(2).

Prior to the 2005 enactment of the Bankruptcy Abuse Prevention and Consumer

Protection Act (BAPCPA), §547(c)(2) was written in the conjunctive, and a creditor seeking to

invoke the ordinary course defense had to meet a three-part test: First, the debt was incurred in

the ordinary course of business of a debtor and the transferee.  Second, the payment was made in

the ordinary course of business or financial affairs of the debtor and the transferee.  Third, the

payment was made according to ordinary business terms.  After the BAPCPA amendments,

§547(c)(2)(A) and (B) are now written in the disjunctive, meaning that once a creditor

establishes the debt was incurred in the ordinary course of business of the debtor and the

transferee, the creditor must prove *either* that the payment was made in the ordinary course of

business or financial affairs of the debtor and the transferee *or* that it was made according to

ordinary business terms.  While the 2005 amendment eased the creditor's burden of establishing

an ordinary course defense by making the subparts disjunctive, it did not alter the language of

what is now codified as §547(c)(2)(A) and (B).  Thus courts addressing the interpretation of

those subparts continue to look to pre-BAPCPA cases for guidance in interpreting those sections,

such as the Fourth Circuit's opinion in *Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir. 1994).

Here, defendant does not assert a defense under §547(c)(2)(B). The disputes between the parties are whether plaintiff's debts were incurred by the plaintiff and the defendant in the ordinary course of business and whether the transfer was made in the ordinary course of business or financial affairs of the plaintiff and the defendant. Because the court concludes that the defendant has not met her burden of showing that the transfer was made in the ordinary course of business or financial affairs of plaintiff and defendant, as required by §547(c)(2)(A), the court need not address the first question.

"Whether a transfer was made in the ordinary course of business of the debtor and the defendant is a subjective inquiry in which the defendant must demonstrate that the disputed payments were ordinary in relation to prior course of dealings between debtor and defendant." *In re Clean Burn Fuels,* 2014 WL 2987330, at *4 (Bankr. M.D.N.C. July 1, 2014) (citing *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 848 (7th Cir. 1997)); *see also*, *In re Anderson Homes, Inc.,* 2013 WL 1279403, at *6 (Bankr. E.D.N.C. Mar. 28, 2013) ("The ordinary course of business between the parties under § 547(c)(2)(A) is a subjective test, focusing on the particular relationship between two parties."). The subjective inquiry is a "peculiarly factual analysis." *In re Clean Burn Fuels*, 2014 WL 2987330, at *5.

Courts typically consider four factors in making a determination of whether a transaction is "ordinary" between the parties: "(1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount and form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Id.* (citing

*Kleven v. Household Bank F.S.B.* 334 F.3d 638, 642 (7th Cir. 2003)). In essence, the
"cornerstone of [a §547(c)(2)(A)] preference defense is that the creditor needs to demonstrate
some consistency with other business transactions between debtor and creditor." *In re Gem
Const. Corp. of Virginia*, 262 B.R. 638, 655 (Bankr. E.D.Va. 2000) (quoting *WJM, Inc. v.
Massachusetts Dep't of Pub. Welfare*, 840 F.2d 996, 1011 (1st Cir. 1988)).

A critical component of the four factor analysis is the establishment of a pre-preference
period baseline of payment practices between the debtor and creditor. The baseline allows the
court to compare the transfers during the preference period with the parties' course of dealings
before the preference period to determine if the payments during the preference period differed
in timing or form, or were otherwise unusual.

In this case, however, a baseline period cannot be established because defendant did not
provide any services to plaintiff prior to the preference period. Courts have taken various
approaches where a creditor only receives payment during the preference period and no pre-
preference period baseline is available.

A minority of courts have concluded that if "the Creditor fails to establish a baseline from
which the court can compare the disputed transfers, the inquiry ends as the court is unable to
ascertain the subjective standard of comparison. In such instances, the section 547(c)(2)(A)
defense likewise must fail." *In re Clean Burn Fuels*, 2014 WL 2987330, at *6; *see also In re
Waring*, 491 B.R. 324, 334 (Bankr. E.D.N.Y. 2013) (finding that the defendant "has failed to
establish a 'baseline of dealings' to enable this Court to compare the Payment to the parties'
prior course of dealings, and [the defendant] has failed to satisfy its burden of proof under
§547(c)(2)(A)."). *See also In re Brown Transport Truckload, Inc.*, 152 B.R. 690, 692 (Bankr.
N.D.Ga. 1992) (holding that "[i]f there is no prior course of dealings between the parties, the

transferee cannot satisfy this element [of §547(c)(2)(A)], and the transfer may be avoided.").
The rationale of these cases is that without an established pre-preference payment history the
court cannot determine what was the ordinary practice between the parties.

The majority of courts, however, have held that a history of prior dealings is not
necessary to establish a defense under §547(c)(2)(A). *See In re Air South Airlines*, 247 B.R. 165,
172 (Bankr. D.S.C. 2000) (rejecting the argument that §547(c)(2)(A) requires "a history of prior
dealings as a sine qua non in order to afford a transferee the protections of §547(c)(2)."). *See
also, In re Conex Holdings, LLC,* 518 B.R. 269 (Bankr. D.Del. 2014) (following various
opinions from the Sixth, Seventh, and Ninth Circuits, the Tenth Circuit's Bankruptcy Appellate
Panel which have held "that a first-time transaction between a debtor and a creditor may still
qualify as an ordinary course transaction for the purposes of §547(c)(2)."). These courts have
developed different criteria when a baseline cannot be established to determine whether a
transaction occurred in the ordinary course of business. "Some courts have concluded that '[i]n
the absence of any prior transactions, courts typically look to see if the debtor complied with the
payment terms of its contract.'" *In re Air South Airlines*, 247 B.R. at 172 (quoting *Payne v.
Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1021 (10th Cir. B.A.P.
1998)). Still, "[o]ther courts have held that, in conducting an analysis under subsection B, '[t]he
Court need not . . . rely solely upon the previous transactions between the parties, but also may
look to similar transactions between either of the parties and third persons in determining
whether the transfer was ordinary.'" *Id.* (quoting *Energy Coop., Inc. v. Fina Oil & Chemical Co.
(In re Energy Coop., Inc.)*, 103 B.R. 171, 176 (N.D.Ill. 1986)). Finally, "other courts have
concluded that 'it is what is normal between the two parties that controls, not necessarily the

printed words of an invoice.'"  *Id.* (quoting *Tomlins v. BRW Paper Co. (In re Tulsa Litho Co.)*,

229 B.R. 806, 810 (10th Cir. B.A.P. 1999)).

      Here, as spouse of the plaintiff's President and Chief Executive Officer, the defendant is

an insider.  The court has not located any cases that consider what standard should apply under

§547(c)(2)(A) to insider creditors that have no pre-preference period relationship with the debtor.

      The rationale for adopting the minority approach that no ordinary course defense is

available to a creditor with no pre-preference period business relationship with the debtor is

stronger for insider creditors than non-insiders.  An argument can be made that an insider that

only begins to transact business with the debtor during the preference period does so at its own

risk.  Nevertheless, the court agrees with those courts that reject the view that no ordinary course

defense is available to a creditor with no pre-preference period business relationship with the

debtor.  The absence of any pre-preference period transactions should not foreclose a creditor,

even an insider, from attempting to establish a §547(c)(2)(A) defense through some other

evidence.

      The question becomes what is the other evidence an insider can use to establish that the

transfers were made in the ordinary course in the absence of a pre-preference period relationship.

Here, defendant asks the court to consider plaintiff's transactions with other contractors and

argues that those dealings establish that other contractors were paid in the same manner and on the

same terms as defendant.  ECF 44 at 3.[2]  The court will assume that such a showing would

---

[2] Defendant does not ask the court to look solely to the transactions between defendant and plaintiff during the preference period to determine whether the transfers were in the ordinary course between the parties.  An insider's relationship with the debtor is subject to careful scrutiny, *Butler v. David Shaw, Inc.,* 72 F.3d 437, 443 (4th Cir. 1996).  Thus, because an insider is in a unique position to obtain special or preferential treatment, it would seem to be an unconvincing preference defense that the insider is able to consistently realize those special or preferential benefits during the preference period.

establish a defense under §547(c)(2)(A), and further concludes that the defendant failed to make that showing.

The defendant was routinely treated differently and more beneficially than other contractors, both in terms of the manner and timing of payments.  Mr. Harris, as the President and CEO of the plaintiff, and husband of the defendant, routinely prepared the invoices for the defendant from information that she told him.  The invoices often were nothing more than a list of workers and the hours they worked during the week.  No description was given of the work being performed.  At times the invoice did not even show the workers, but just the total number of hours multiplied by an hourly rate, again with no explanation of the work performed.

After he prepared the invoices, Mr. Harris walked them to the paying department to be sure they were paid immediately.  The defendant was paid on the same day that Mr. Harris prepared the invoice on all but three occasions.  On those three occasions, the defendant was paid one day after invoice on two occasions and one day after invoice on the other occasion. On three occasions, defendant was paid in cash, and there is no indication that an invoice even was prepared.

Thus, during the period when the plaintiff had defaulted on its loans and announced there was a "good possibility" it would have to liquidate its assets, defendant never was in a position of risk on nonpayment.  All of her transactions were handled as expeditiously as one could imagine, to the point where the CEO prepared her invoices and ensured she was paid immediately.

No other contractor functioned in this manner.  They submitted their own invoices, and provided descriptions of the work performed.  According to the testimony of Ronald Lee Nicholson, an employee of the debtor who managed other contractors working on the OREO, he

would obtain a quote or bid before they started work on a project.  The bid would provide sufficient detail so he could understand the scope of the work to be performed.  Once approved, he would provide the contractor with an initial draw.  When that phase of the work was completed, the contractor would request a second draw, and so on, providing a description of the work performed in sufficient detail to allow him to understand what was done.

The plaintiff submitted Exhibit 32 that showed its calculation of the number of days it took to pay invoices of vendors other than the defendant.  While the plaintiff admits that some invoices were paid quickly and even on the same day as submitted, it also points out that many invoices were paid long after the submission of the invoice.  Indeed, Exhibit 32 shows numerous instances where creditors were paid much longer than the same day payment usually made to the defendant.  Of the 43 entries on Exhibit 32 of payments to contractors other than defendant during the preference period, 20 payments were made materially longer after invoice than the timing of payments to the defendant.  The number of days after invoice until payment of these 20 payments follows: 79, 27, 5, 13, 25, 31, 10, 6, 6, 27, 20, 12, 5, 8, 5, 9, 25, 30, 40, and 9.

The defendant disagrees that the plaintiff's chart accurately reflects the plaintiff's payment history with other contractors.  She challenges some line items on Exhibit 32, and argues that some of the invoices may have been received after the invoice date.  That may or may not be true, but the burden is on the defendant, not the plaintiff, to establish the §547(c)(2) defense.  The defendant does not carry that burden by simply jabbing at the debtor's evidence.  If the defendant sought to establish that the timing and terms of payment to the defendant was the same as for other contractors, it was her burden to prove that other than by anecdotal or general evidence that "some" contractors were paid quickly and others "could" have been paid later.

The defendant rested her §547(c)(2)(A) defense on her claim that she was treated no differently than other contractors and that other contractors were paid in the same manner and on the same terms as her.  The court concludes that defendant failed to establish an ordinary course defense under §547(c)(2)(A).

Defendant's second defense is that, even if the payments are avoidable preferences, she should only be obligated to return the profit she earned from the work she performed.  She states she paid a large portion of the payments to the workers who did the work, and she bought supplies with some of the payments.  Her position is that the plaintiff must pursue preference claims against the parties to whom she paid the funds.  She cites no authority for this position.

As pertinent here, §550 provides that, to the extent a transfer is avoided under §547, the trustee may recover the property transferred or the value of the property from the initial transferee or, with certain limitations, any immediate or mediate transferee.  Thus the plaintiff can properly seek recovery of the payments from the defendant, as the initial transferee.

### Conclusion

For the foregoing reasons, the court will enter judgment in favor of the plaintiff in the amount of $134,717.15.

cc:     Plaintiff
        Plaintiff's Counsel
        Defendant
        Defendant's Counsel
        U.S. Trustee


**END OF MEMORANDUM OF DECISION**